WARTSILA NSD NORTH AMERICA, INC., Plaintiff,

v.

HILL INTERNATIONAL, INC., Defendant/Third–Party Plaintiff,

v.

John H. Clegg, Esquire, Daphne McNutt, Esquire, and Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., Third–Party Defendants.

No. CIV.A. 99–4565(SSB).

United States District Court, D. New Jersey.

Dec. 30, 2003.

Michael Ochs Adelman, Esq., Drinker, Biddle & Shanley LLP, Florham Park, NJ, for Plaintiff Wartsila NSD North America Inc.

Jane Ward Voegele, Esq., Dechert, Price & Rhoads, Princeton, NJ, for Defendant/Third–Party Plaintiff Hill International, Inc.

Marianne Johnston, Esq., Stradley, Ronon, Stevens & Young, Cherry Hill, NJ, for Third–Party Defendants John H. Clegg, Esq., Daphne McNutt, Esq., and Chaffe, McCall, Phillips, Toler & Sarpy LLP.

## OPINION REGARDING DEFENDANT HILL INTERNATIONAL'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY

BROTMAN, District Judge.

Presently before the Court is a motion *in limine* filed by Defendant Hill International Inc. ("Hill") seeking to exclude the testimony of two expert witnesses under Rule 702 of the Federal Rules of Evidence. For the following reasons, Hill's motion will be granted with regard to Robert C. McCue, but denied as to the Thomas D. Beisecker.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Court recently had cause to recount the facts of this case. They are repeated here to the extent relevant:

In July 1994, Wartsila Diesel, Inc., an engineering and construction company and the predecessor to Plaintiff Wartsila NSD North America, Inc. ("Wartsila"), entered into a contract with Coastal Salvadorian Ltd. ("Coastal"), wherein Wartsila agreed to design, engineer, procure, construct, start up and test a diesel engine power plant in Nejapa, El Salvador ("the Project"). (Pl.'s First Supplemental & Amended Complaint at ¶ 6). Wartsila, whose business had up to that point focused primarily on the sale and maintenance of diesel engines, in turn subcontracted much of the plant's construction to a variety of other entities, including Black & Veatch International ("BVI"). (*Id.* at ¶¶ 7–8). The Project quickly fell behind schedule, resulting in numerous contractual disputes between Wartsila, BVI, and Coastal. (*Id.* at ¶ 9). In an effort to get the project back on track, Wartsila sought the services of a construction consulting firm that could provide expert advice and management for the Project. (*Id.* at ¶ 10).

On January 18, 1995, Hill International, Inc. submitted a proposal for the consulting position. (*Id.* at ¶ 31). In its proposal, Hill recommended that Richard LeFebvre, one of the firm's senior consultants, be assigned to the Project to "collect, organize and evaluate ... factual information and report .. his findings as to the best way to proceed with the completion of the project." (*Id.* at ¶ 33). LeFebvre's responsibilities were to include gathering information and materials related to the construction project, visiting the project site "to evaluate the adequacy of the plans and specifications," and comparing the actual performance of the construction work to Wartsila's obligations under its contract with Coastal. (*Id.*). Attached to the proposal was a copy of LeFebvre's professional resume which represented that he: (a) had received a B.S. in electrical engineering from Penn State in 1966; (b) had earned a B.A. in business administration from Duquesne University in 1969; (c) had taken courses in business law at the University of North Florida in 1983; and (d) was registered and licensed as a professional engineer in

Pennsylvania, New York, and Massachusetts. (*Id.* at ¶ 32).

On January 24, 1995, Wartsila and Hill entered into a written consulting agreement that incorporated by reference the January 18 proposal. (*Id.* at ¶ 34). Pursuant to the terms of the agreement, Hill assigned LeFebvre to work as a senior consultant on the Project. (*Id.* at ¶ 35). LeFebvre was quickly promoted by Wartsila to the position of Project Manager and continued to work on the Project as a Hill employee until May 25, 1995. (*Id.* at ¶¶ 37, 40). Among his responsibilities was the task of analyzing issues bearing on potential claims and defenses in contractual disputes between Wartsila and BVI. (*Id.* at ¶¶ 38–39).

On June 1, 1995, with Hill's approval, Wartsila hired LeFebvre "as an independent contractor to provide assistance with construction and claims management on the Project." (*Id.* at ¶ 41). Based in part on LeFebvre's analysis and recommendations, Wartsila in May 1996 decided to pursue claims against BVI before the American Arbitration Association and retained the Louisiana law firm of Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., and two of its attorneys, John H. Clegg, Esq., and Daphne McNutt, Esq., to initiate arbitration proceedings against BVI in Charlotte, North Carolina. (*Id.* at ¶ 43; Third Party Complaint at ¶ 11). LeFebvre became a "key witness" in the proceedings due to his intimate and extensive knowledge of the facts underlying the points of contention between the two parties and his participation in the drafting of various "claim support" documents. (Pl.'s First Amended Compl. at ¶¶ 43–44).

At the arbitration proceedings in September 1997, LeFebvre offered testimony regarding the academic and professional credentials listed on his resume. (*Id.* at ¶ 47). On September 8, 1997, toward the end of his direct testimony, Wartsila became aware, "for the first time," that there were questions concerning LeFebvre's educational and professional credentials when counsel for BVI requested that LeFebvre execute a release for background academic information. (*Id.* at ¶ 48). Later that day, after the proceedings had been adjourned, LeFebvre admitted to Wartsila's attorneys that the statements on his resume concerning a business degree from Duquesne University were not accurate. (*Id.* at ¶ 49). He allegedly told Wartsila that Hill had asked him to overstate the extent of his training at Duquesne. (*Id.*).

The next morning, LeFebvre requested and received from Hill a revised resume which omitted any reference to a business degree from Duquesne or business law courses at North Florida and modified the date on which he claimed to have received an electrical engineering degree from Penn State. (*Id.* at ¶ 50). When the proceedings resumed later that day, BVI's attorneys subjected LeFebvre to a vigorous cross-examination, forcing him to acknowledge the obvious inconsistencies between the two resumes. LeFebvre nevertheless insisted that the revised resume was entirely accurate and truthful. (*Id.* at ¶ 50(b)). However, by the conclusion of the day's proceedings, Wartsila's attorneys were forced to concede that a hasty investigation into LeFebvre's academic credentials had uncovered no evidence that he had ever received an engineering degree from Penn State or attended any of the other schools listed on his resume. (*Id.* at ¶ 51). Wartsila also found no evidence that LeFebvre had ever been licensed as a professional en-

gineer in either New York, Pennsylvania, or Massachusetts. (*Id.*).

In light of LeFebvre's perjury, Wartsila's counsel withdrew his testimony, and the arbitration panel granted Wartsila a short recess to restructure its case based on new witnesses. (*Id.* at ¶ 53). During that time, the company re-examined materials prepared by LeFebvre and discovered that he had improperly altered original "claim support" documents. (*Id.* at ¶ 53). Consequently, Wartsila was forced to withdraw certain claims. (*Id.*). On March 5, 1998, the arbitration panel issued a judgment of $4.65 million in favor of BVI. (*Id.* at ¶ 57). Wartsila attributes the arbitration award to the complete loss of credibility it allegedly suffered as a result of LeFebvre's blatant misrepresentations, both on his resume and in his testimony before the arbitration panel. (*Id.* at ¶ 52).

In November 1997, shortly after LeFebvre was exposed as a fraud and a perjurer, BVI brought claims in tort and contract against Wartsila in the United States District Court for the District of Kansas ("Kansas litigation"). (*Id.* at ¶ 58, 60). The lawsuit was based on Wartsila's "placement of an individual lacking in the necessary education, skills, professional licenses and trustworthiness as Project Manager charged with oversight of BVI's work." (*Id.* at ¶ 59). Wartsila ultimately settled this

dispute with BVI for $850,000. (*Id.* at ¶ 61).

*Wartsila NSD North America, Inc. v. Hill International,* 269 F.Supp.2d 547, 549–51 (D.N.J.2003).

Wartsila subsequently initiated the present litigation against Hill in the United States District Court for the District of New Jersey.[1] As amended, Wartsila's complaint asserts claims for negligence, fraud, and breach of contract and seeks recovery of both compensatory and punitive damages for the harm allegedly suffered as a result of the misrepresentations concerning LeFebvre's academic and professional credentials. Thus, one of the crucial issues to be confronted by the jury at trial is whether the outcome of the BVI arbitration was a product of a substantive consideration of the merits of the claims involved (as Hill contends) or was instead due to the complete loss of credibility allegedly suffered by Wartsila as a result of LeFebvre's perjury and falsified resume and the subsequent withdrawal of his testimony (as Wartsila has alleged). Wartsila has produced two expert witnesses that it intends to call at trial and whose testimony will speak to this issue, although from differing perspectives: Robert McCue, an engineering consultant with past experience as an arbitrator, and Thomas D. Beisecker, Ph.D., an expert in speech communication.

Hill has filed a motion *in limine,* the subject of today's opinion, seeking to have

---

1. Wartsila initially retained attorneys Clegg and McNutt, who had left the Chaffe firm to join the New Orleans law firm of McGlinchey Stafford, LLC, to represent it in this suit. However, Clegg and McNutt have since been added as Third Party Defendants in this case and thus they are no longer representing Wartsila. Hill filed the Third Party Complaint in August of 2001, asserting claims for contribution and indemnification against Clegg, McNutt, and the Chaffe law firm.

Hill's complaint alleges that, as counsel for Wartsila during the BVI arbitration proceedings, Third Party Defendants acted recklessly and negligently and that it was their failure to provide Wartsila with "adequate legal representation" which caused the losses Wartsila allegedly sustained in both the BVI arbitration and the Kansas litigation. *See generally Wartsila,* 269 F.Supp.2d 547 (denying third party defendants' motion to dismiss for lack of personal jurisdiction).

the testimony of McCue and Beisecker excluded as inadmissable under Rule 702 of the Federal Rules of Evidence and relevant precedent. The Court is thus charged with the task of judging the credentials of two experts who propose to opine on the effects of falsified credentials and lost credibility on a judicial proceeding.

## II. THE RULE 702 STANDARD

■ The admissibility of "expert" testimony is a question of law governed by Rule 702 of the Federal Rules of Evidence. When faced with a Rule 702 inquiry, the court must determine, pursuant to Rule 104(a), whether the testimony satisfies the standard "evidentiary reliability" and whether it will assist the trier of fact to understand or determine a fact in issue. This is the trial court's "gatekeeping" role, as the Supreme Court referred to it in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Although *Daubert* addressed the trial court's role with particular regard to *scientific* knowledge, the Supreme Court has since made clear that the holding (and the trial court's obligation) also extends to "testimony based on technical and other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Rule 702, as amended in 2000, "affirms the trial court's role as gatekeeper" as it was described in *Daubert* and *Kumho.* See FED. R. EVID. 702 advisory committee's note. The current version provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill experience, training, or education, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. The proper exercise of the gatekeeping function has been further clarified by subsequent decisions of the Third Circuit Court of Appeals. *See e.g. Oddi v. Ford Motor Co.,* 234 F.3d 136 (3d Cir.2000); *Heller v. Shaw Indus., Inc.,* 167 F.3d 146 (3d Cir.1999); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir.1994) ("*Paoli II*").

■ In *Paoli II,* the Third Circuit articulated the three requirements for the admissibility of expert testimony under Rule 702: qualification, reliability and fit. First, the proffered witness must be a qualified expert. This requirement has been interpreted liberally, encompassing a broad range of knowledge, skill and training that may qualify an expert as such. Second, the testimony must be reliable. That is, it must be based on methods and procedures of science rather than on subjective belief or unsupported speculation, i.e., an expert must have "good grounds" for his or her belief. Third, the expert's testimony must "fit" the facts of the case; it must be relevant and assist the trier of fact in its determination of an issue in dispute. *Paoli II* at 741–42; *see also Calhoun v. Yamaha Motor Corp.,* 350 F.3d 316 (3d Cir.2003) (discussing this "trilogy of restrictions" on expert testimony); *Schneider v. Fried,* 320 F.3d 396, 405 (3d Cir.2003) (same).

## III. ANALYSIS

### A. Robert McCue

Wartsila seeks to admit the testimony of Robert C. McCue, a consulting engineer with nearly 30 years of experience who holds a B.S. in mechanical engineering

from Pennsylvania State University. McCue has spent much of his professional career working on national and international construction projects in much the same capacity as LeFebvre did for Wartsila. He has also provided expert testimony in numerous trials and even arbitrated a number of construction disputes. Wartsila claims that McCue's testimony speaks "not to the issue of credibility, but to engineering" and that McCue is qualified to opine issues of engineering, arbitration and damages. (Pl.'s Mem. Opp. at 15.) If only the scope of McCue's expert opinion were limited to such matters, the Court would have little difficulty finding it admissible under Rule 702. However, Wartsila's depiction is not supported by a review of the proffered testimony.

Although McCue's report is peppered with technical descriptions of the underlying project disputes that formed the basis of Wartsila's arbitration claims, the conclusions are, in fact, directed at credibility and causation. The central theme of McCue's report, repeated so as not to be missed, is that "due to the acts of Hill International, Wartsila is entitled to recover $3,832,236" for losses in the BVI arbitration and nearly $2,000,000 in additional related costs. (McCue Exp. Rpt. at 5, 23.) The bulk of the report is spent on an itemization of these amounts. McCue breaks the arbitration down into each of the project disputes at issue in the BVI arbitration, describing them in some technical detail and then explaining that, because LeFebvre's testimony had to be withdrawn and replaced by experts who were not as involved in such matters from the start, Wartsila is entitled to recover a specific dollar amount for that claim. The underlying premise is that the "[t]he exposure of Mr. LeFebvre's falsified credentials formed a fundamental obstacle as to both proof and credibility that no amount of collateral testimony by replacement witnesses could overcome." (*Id.* at 8–9.)

Despite Wartsila's characterization of the testimony,[2] it is clear McCue proposes to speak not only to Wartsila's credibility in the arbitration and the causation of it, but also to issues of liability and damages. If accepted by the jury, his testimony would cover the whole of the case leaving

---

**2.** McCue's testimony consists of a seriatim recounting of the factual circumstances of each arbitrated claim followed by conclusions which, although generally avoiding the words "credibility" and "causation," reaches the same matters by using terms like "persuasion," and finding that the loss was "due to" or "because of" the actions of Hill. For example, on a claim in the amount of $26,336.39 regarding the design and installation of a "quantum meter," McCue describes the instrument and the claim and then concludes that, without LeFebvre, "Wartsila was denied the opportunity to present its case in the most persuasive manner possible. *For this reason,* and because of the *shadow of doubt* cast upon Wartsila's case in general, the arbitrators awarded zero for this claim item" (McCue Exp. Rpt. at 17) (emphasis added.) Regarding a claim for "Radiator Deficiencies" in the amount of $745,643.92, "[i]t is [McCue's] opinion that, the [zero] award is *due to* the

lingering effects of the LeFebvre falsifications. Therefore, Wartsila is entitled to recover $745,643.92 from Hill International for the loss of its claim." (*Id.*) (emphasis added.) On a claim related to mechanical supervision, McCue concludes that:

> "Wartsila was thus denied an opportunity to put its best case forward due to Mr. LeFebvre being rendered an unfit and untrustworthy witness. This result, as well as the *poisoning* of Wartsila's case in general in the eyes of the arbitrators, *led to* an award of zero for mechanical supervision. Wartsila is, therefore, entitled to recover $487,334.00 from Hill due to the loss of the claim."

(*Id.* at 16) (emphasis added.) Because the McCue report is replete with determinations of causation and credibility (these are but a few examples), the Court finds Wartsila's depiction of the testimony is disingenuous at best.

nothing left to be determined. However, given McCue's substantial professional experience as an arbitrator of similar disputes, it is possible that he is qualified to speak with authority even on such a sweeping range of subject matter. Hill's objection is most appropriately aimed at the reliability of McCue's testimony.

The courts of this Circuit have long observed the mandate of Rule 702 that expert testimony must be reliable and not merely relevant. Long before the Supreme Court laid out the trial courts' gatekeeping function in *Daubert*, the Third Circuit in *United States v. Downing* articulated a group of factors to guide the trial court in its determination of reliability. 753 F.2d 1224, 1226 (3d Cir.1985). Later, in *Paoli II*, the Circuit Court held that a "district court should take into account all of the factors listed by either *Daubert* or *Downing*, as well as any others that are relevant." 35 F.3d at 742. The inquiry into the reliability of expert testimony is thus guided by the following factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n. 8. In assessing reliability, a court need not rely exclusively on this list but may take account of other relevant factors. *Id.; Kumho*, 526 U.S. at 151, 119 S.Ct. 1167 (observing *Daubert's* factors "were meant to be helpful, not definitive"). "[A] party seeking to exclude (or to admit) expert testimony must do more than enumerate the factors from Daubert ... And tally the number that are met or not met by a particular expert's testimony." *Heller*, 167 F.3d at 152. Because the *Daubert* factors were developed with particular regard to scientific methodology, for cases involving so-called "non-scientific" opinions, the "relevant reliability concerns may focus upon personal knowledge or experience," as opposed to "scientific foundations." *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167. Wartsila argues that there are "good grounds" for McCue's opinion notwithstanding the failure to satisfy these factors. According to Wartsila, McCue relies upon his education, knowledge, and professional experience as an engineer when he identifies the need for an arbitration witness with first hand knowledge, such as LeFebvre, and identifies the harm that comes from the lack of a properly qualified witness. However, as already noted, McCue's testimony would go far beyond Wartsila's innocuous depiction.

Wartsila provides no methodology for McCue's assessment of damages except his own view of the merits, no methodology for McCue's inference that LeFebvre's fraud should lead to Hill's liability, no methodology for any of the other inferences that must be drawn before one may finally conclude that Wartsila is entitled to recover from Hill. *See General Electric Co. v. Joiner*, 522 U.S. 136, 145–46, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *Paoli II*, 35 F.3d at 743 ("the requirement of reliability, or 'good grounds' extends to each step in the experts analysis"). The Court, and the jury, is left with nothing more than subjective belief; that Wartsila should recover simply because McCue thinks Wartsila should recover.

Wartsila rightfully points out that the inquiry into reliability is intended to be a "flexible one" and that the list of *Daubert/Downing* factors is neither exclusive nor dispositive. *See Daubert*, 509 U.S. at 594, 113 S.Ct. 2786. However, there is no attempt to address those factors at all or to provide the Court with any alternative standards on which a reliability determination may be based. Although the reliability inquiry must bend with the particular idiosyncrasies of the relevant expertise under consideration, the Court may not abdicate its gatekeeping role merely because an expert relies on general experience or principles. *See Milanowicz v. Raymond Corp.*, 148 F.Supp.2d 525 (D.N.J.2001) ("noting that 'it would seem exactly backward' to allow experts who purport to rely on general experience to escape screening simply by stating that their methods were not reached by any particular method or technique") (quoting *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir.1997)). In this case, there is simply too great of an analytical gap between an assessment of the importance of first-hand knowledge in an engineering arbitration and McCue's conclusion that Wartsila should recover. *See Joiner*, 522 U.S. at 145–46, 118 S.Ct. 512. The expert testimony of Robert McCue is inadmissable under Rule 702.

### B. Beisecker

Wartsila also seeks to admit the testimony of Thomas D. Beisecker, a Professor of Speech Communication at the University of Kansas. Beisecker has published numerous articles regarding communications, witnesses and trial preparation and has served as an expert witness on dozens of cases. His proffered testimony draws on theories of persuasion and social influence to analyze the statements of the BVI arbitrators before, during, and after the discovery of LeFebvre's fraud and perjury. He draws from the massive arbitration record specific evidence that: (1) the discovery of LeFebvre's lies caused members of the arbitration panel to view him as untrustworthy; which (2) caused the members of the panel to be negatively biased toward the information presented by Wartsila; (3) to disbelieve explanations for Wartsila's decisions during the project; and (4) to negatively evaluate evidence and exhibits presented by LeFebvre even though they were later discussed by other Wartsila witnesses; (5) that continued references to LeFebvre in the arbitration even months after his testimony was withdrawn continued to reinforce the above effects; and (6) "[e]ven assuming Wartsila's case had substantial merit it is highly unlikely that Wartsila could have prevailed in front of the panel because of" the response to LeFebvre's testimony. (Beisecker Exp. Rpt. at 11.)

Hill argues that Beisecker is not qualified to render such opinions, that his methodology is not reliable, and that his testimony does not fit with the facts of the case. Underlying each of these objections is the presumption that Beisecker will testify to the ultimate question of causation— whether the arbitration loss was indeed the result of a loss of credibility before the panel. However, a review of the submitted expert report reveals that this is not the case. Beisecker's Conclusion No. 6, relied upon by Hill, does not purport to decide the merits of Wartsila's claims, as Hill suggests. Rather, the merits are left to be determined through the presentation of other evidence not now before the Court. If the fact finder were to determine that Wartsila's claims lacked merit, then any alleged taint due to LeFebvre could not be the cause-in-fact of Wartsila's injury. Beisecker does not address the merits of Wartsila's case and so he does not opine on the issue of causation. He merely provides an analysis of the arbitra-

tion record and makes an educated and informed assessment of the effect of Le-Febvre's fraud on the arbitration panel's perception of Wartsila's case.

■ The Court's reading of the Beisecker report severely undercuts the objections raised by Hill. For instance, Hill contends that Beisecker is not qualified to address the merits of the claims and the reasons for the arbitrators' decision in a complex construction litigation such as it was. On the contrary, Beisecker has published, researched and testified on the subject matter of his opinion. His opinions are properly limited to issues surrounding the impact of credible sources and the loss thereof on the fact-finder, in this case, the arbitration panel. Because the Court disagrees with the depiction of Beisecker's proffered testimony, and because Beisecker is clearly a qualified expert on the subject matter on which he proposes to testify, the Court finds that Hill's objection to Beisecker's qualifications as an expert are without merit.

Hill also attacks the reliability of Beisecker's testimony, claiming that the conclusions regarding the bias of Arbitrator Davis (the only neutral arbitrator on the panel of three) are based on stray comments gleaned from the arbitration transcript. In any event, Hill contends that none of the statements relied upon in Beisecker's analysis of the arbitration reveal any sort of inherent bias. However, this argument is more appropriately addressed to the trier of fact at trial. As the Supreme Court noted in *Daubert*, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. "[E]ven if the Judge believes 'there are better grounds for some alternative conclusion,' and that

there are some flaws in the scientist's methods, if there are 'good grounds' for the experts conclusion, it should be admitted." *Heller*, 167 F.3d 146 (quoting *Paoli II*, 35 F.3d at 744). Far from being completely untestable (as Hill argues), Beisecker's method is applied to clearly identified passages from the transcript. If Hill objects to the manner in which those passages were selected or the conclusions that were drawn therefrom, it need do nothing more than to point the jury in the direction of contradictory statements. Beisecker relies on accepted methods of social science which, although they may be "shaky," provide a reliable connection between the arbitration record and his conclusions. His methods are the subject of peer reviewed publications and he holds a doctorate degree in the field. Beisecker's methods are reliable. Moreover, they clearly "fit" the disputed factual issues at hand, in that they will assist the trier of fact in assessing the transcript of the BVI arbitration. *See Downing*, 753 F.2d at 1237 (fit depends in part on the connection between the research to be presented and the particular factual disputes of the case). Beisecker's proffered testimony is admissible under Rule 702.

## IV. LEGAL MALPRACTICE / RULE 403

Hill raises one final objection to the proffered testimony which does not fit neatly into the above analysis. Hill points to the clear similarities between the facts of this case and cases involving legal malpractice and argues that trial courts considering legal malpractice cases have consistently held that allowing expert testimony on the ultimate issue of causation would impermissibly invade the exclusive domain of the fact-finder. Assuming that Beisecker's proffered testimony, while stopping short of the ulti-

mate issue of causation, may be construed to reach into this domain, the Court will entertain Hill's argument.

As a preliminary matter, the Court agrees with Hill that the issues are analogous to those faced in the legal malpractice context. As in a legal malpractice case in which jurors are called upon to consider the impact of an attorney's malpractice on the outcome of his client's underlying claims, a jury is perfectly capable of reviewing the transcripts and other evidence relating to the underlying arbitration proceedings and deciding whether the arbitration panel would have decided the dispute in Wartsila's favor had LeFebvre been able to testify as a credible witness. Yet it is unclear why this conclusion should compel a different evidentiary standard than the one that was discussed and applied above.

Hill appears to argue that because a lay jury is fully qualified to make determinations as to credibility and causation, expert testimony should not be permitted. In support, Hill cites to a number of state trial court and appellate decisions from across the country which have purportedly held such testimony inadmissable. However, the Court finds it unnecessary to discuss these cases in all their minutiae since the only controlling precedent cited by Hill, the Third Circuit's opinion in *Honeywell v. American Standards Testing Bureau, Inc.*, 851 F.2d 652 (3d Cir.1988), would seem to foreclose any sweeping prohibition of expert testimony in the malpractice context.

In *Honeywell*, the plaintiff had sued its insurer for failing to provide an expert witness for the defense of a negligence action brought in state court. At trial, the plaintiff relied on the testimony of an experienced trial attorney who testified that the Plaintiff's defense in the underlying state court action "would have been suc-

cessful had it been able to present expert opinion testimony." *Honeywell*, 851 F.2d at 656. On appeal, it was argued that the expert should not have been allowed to express an opinion on what a jury would have done, as jurors themselves were qualified to speculate as to the probable effect of additional evidence. The Appeals Court rejected the appellant's argument in terms that are equally applicable here:

> Trial Courts have broad discretion to admit evidence over the objection that it invades the province of the jury, and the Rule 702 standard usually favors admissibility. *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985). To the extent that [Hill's] argument may be interpreted to assert a violation of Fed.R.Evid. 403, we find no possibility of undue prejudice. The expert's conclusions [are] readily verifiable by the jury, which [will be] presented with all of the evidence upon which the expert's opinion was based.

*Honeywell*, 851 F.2d at 656–57 (footnote omitted); *see Paoli II*, 35 F.3d at 746–47 (observing that expert evidence may often confuse and overwhelm a jury and discussing the application of Rule 403's balancing test after *Daubert*); *see also Downing*, 753 F.2d at 1229 (" 'an expert can be employed if his testimony will be helpful to the trier of fact in understanding evidence that is simply difficult, [though] not beyond ordinary understanding.' ") (quoting S. SALTZBURG & K. REDDEN, FEDERAL RULES OF EVIDENCE MANUAL 451 (3d ed.1982)); *In re Japanese Prod. Antitrust Litig.*, 723 F.2d 238, 279 (3d Cir.1983) (" 'even when jurors are well equipped to make judgments on the basis of their common knowledge and experience, experts may have specialized knowledge to bring to bear on the same issue which would be helpful.' ") (quoting 3 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE para. 702[02], at 702–9–10

(1982)), *rev'd on other grounds sub nom. Matsushita Electrical Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir. 1996) ("a trial court is not compelled to exclude expert testimony just because the testimony may, to a greater or lessor degree, cover matters that are within the average juror's comprehension"). Thus, although it is possible that expert testimony on causation in legal malpractice cases may raise heightened concerns of undue prejudice in certain circumstances, it does not do so here. Nor does the apt analogy with the legal malpractice context compel a different or higher gatekeeping standard under Rule 702.

## V. CONCLUSION

For the foregoing reasons, Hill's motion will be granted with regard to Robert C. McCue but denied as to Thomas D. Beisecker. An appropriate order will issue.

**ORDER REGARDING DEFENDANT HILL INTERNATIONAL'S MOTION IN LIMINE TO EXCLUDE CERTAIN EXPERT TESTIMONY**

### *ORDER*

**THIS MATTER** having come before the Court on the Defendant Hill International's motion *in limine* to exclude the expert testimony of Robert McCue and Thomas Beisecker;

**THE COURT** having fully considered the submissions of the parties; and

**FOR THE REASONS** stated in an opinion of the Court filed on this same date,

**IT IS** on this ___ day of December, 2003, hereby

**ORDERED** that Defendant Hill international's motion *in limine* to exclude expert testimony is **GRANTED** as to the

testimony of Robert C. McCue and **DENIED** as to Thomas D. Beisecker.