**CHEMIPAL LTD., Plaintiff,**

v.

**SLIM–FAST NUTRITIONAL FOODS INTERNATIONAL, INC.,**
**Defendant.**

**No. CIV.A. 03–550–KAJ.**

United States District Court,
D. Delaware.

Dec. 22, 2004.

R. Karl Hill, and Kevin A. Guerke, Seitz, Van Ogtrop & Green, P.A., Wilmington, DE (Barry I. Fredericks, Esq., Law Offices of Barry I. Fredericks, Hackensack, NJ, of counsel), for plaintiff.

Kimberly L. Gattuso, Saul Ewing LLP, Wilmington, DE (Lewis R. Clayton, and Patricia E. Ronan, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY), for defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

## I. INTRODUCTION

Presently before me are several motions filed by plaintiff Chemipal Limited ("Chemipal") and defendant Slim–Fast Nutritional Foods International, Inc. ("Slim–Fast"). Chemipal filed this action on June 10, 2003, alleging that Slim–Fast committed a material breach of contract, deliberately and intentionally breached its duty of good faith and fair dealing, and breached its promise to provide appropriate advertising and promotion for the sale of Slim–Fast products in Israel. (Docket Item ["D.I."] 1 at ¶¶ 13, 22, 30.) This court has jurisdiction pursuant to 28 U.S.C. § 1332.

Slim–Fast has four pending motions in this case, including a Motion to Dismiss Counts Two and Three for Failure to State a Claim (D.I. 10–1; "Motion to Dismiss"), a Motion for Partial Summary Judgment (D.I.10–2), a Motion to Preclude the Testimony of Dr. Avichai Shuv–Ami at Trial (D.I. 112; "Motion to Preclude Testimony"), and a Motion for Summary Judgment (D.I.116). Chemipal has filed a Motion for Partial Summary Judgment on Counts I

and II of the Complaint (D.I.108). For the reasons that follow, Slim–Fast's Motion to Preclude Testimony, and Motion for Summary Judgment will be granted. The remaining motions will be denied as moot.

## II. BACKGROUND [1]

Chemipal is a corporation organized under the laws of the State of Israel. (D.I. 1 at ¶ 1.) Its primary purpose is to distribute and market various pharmaceuticals, cosmetics, and other products to retail outlets in Israel. (*Id.*) "Slim–Fast" is a business name for Conopco, Inc., a New York corporation. (D.I. 8 at 2.) It is a manufacturer of various snacks and meal-replacements designed to promote weight loss. (*Id.*)

The facts, as viewed in the light most favorable to Chemipal, establish the following. Chemipal and Slim–Fast entered into a written agreement (the "Distribution Agreement"), dated March 11, 1997, in which Slim–Fast and Chemical agreed that Chemipal would be the exclusive distributor of Slim–Fast products in Israel. (D.I. 1, Ex. A at 2.) The dispute between the parties centers on the provisions of the Distribution Agreement pertaining to advertising and promotion. The Distribution Agreement provides that promotion and advertising would be at Slim–Fast's sole discretion.

> The Company [Slim–Fast] shall develop and disseminate at its sole discretion all advertising in connection with the Products. The Company will supply to the Distributor [Chemipal], in its sole discretion, all promotional materials in connection with the Products and Distributor agrees that all such materials shall be the exclusive property of the Company. Any promotional activities and materials initiated by the Distributor shall

be at Distributor's sole cost and must be pre-approved by the Company.

(*Id.*) However, pursuant to Section H of Schedule 'B' of the Distribution Agreement, Slim–Fast was required to create an advertising and promotion plan. Schedule H, titled "Advertising & Promotion," stated:

> The Company will control through its advertising representatives in the Territory the promotion and advertisement concept. The company will create an advertising and promotion plan based on the Distributor's experience in the Territory, the Company's current promotion and advertising concept and the competitive products in the region.

(*Id.* at 8.)

The Distribution Agreement also contains an integration clause in which the parties agreed that the written terms incorporated prior discussions and that any modification of the Distribution Agreement would be in writing:

> This Agreement sets forth the entire agreement and understanding between the parties relating to the subject matter contained herein and merges all prior discussions between them, and neither party shall be bound by any definition, condition, warranty, or representation other than as expressly stated in this Agreement or as subsequently set forth in writing and executed by the party to be bound thereby. This Agreement may be amended, modified, superseded, or canceled only by a written instrument executed by the parties hereto or in the case of waiver, by the party waiving compliance.

(*Id.* at 5.)

In negotiating the Distribution Agreement, Eitan Gal, the Chief Executive Offi-

---

**1.** The following rendition of background information does not constitute findings of fact and is cast in the light most favorable to the non-moving party, the plaintiff.

cer of Chemipal, wrote to Ronald Stern, then President of Slim–Fast, setting forth several comments raised by Chemipal's attorneys to the proposed Distribution Agreement. (D.I.119, Ex. U.) One item of concern was that Chemipal suggested that Slim–Fast should undertake to invest a minimum amount in advertising and promotion of the products. (*Id.* at 2.) Based on subsequent discussions with Mr. Stem, Mr. Gal did not insist on this provision being added to the Distribution Agreement, and in fact, it was not. (D.I. 123, Ex. 1 at 56–60, Dep. Eitan Gal, June 22, 2004; *see* D.I. 1, Ex. A, the Distribution Agreement.)

Prior to the execution of the Distribution Agreement, in the first week of January, 1997, Mr. Gal attended a meeting in New York with Slim–Fast which consisted of a presentation made by Warshavsky Frelich Dover, Grey Advertising's Israeli subsidiary ("Grey Israel"). (D.I. 131 at 2.) The presentation (the "Grey 1997 Plan"), prepared by Grey Israel, was entitled "Slim Fast in Israel Marketing Communication Plan." (D.I. 119, Ex. P at 0366.) The Grey 1997 Plan stated a marketing objective to "[a]chieve 10% market share in the slimming products market during the first year." (*Id.* at 0378.) The Grey 1997 Plan recommended that, to achieve this goal of 10% market share, $880,000 should be spent on advertising. (*Id.* at 0401.) Chemipal alleges that during this meeting, Slim–Fast committed itself to spending at least $700,000 on advertising and promotion of its products in Israel. (D.I. 123, Ex. 1 at 12–17, Dep. Eitan Gal, June 22, 2004.) A summary of the meeting was prepared by Rony Koral of Grey Israel which stated that Grey Israel was "asked to prepare a media plan based upon 400 GRP's [Gross Rating Points] a month." (D.I. 119, Ex. M at 1.) Mr. Gal testified at his deposition that 400 GRP's per month would translate into approximately $900,000. (D.I. 123, Ex. 1 at 29, Dep. Etian Gal, June 22, 2004.) Instead, Slim–Fast spent "roughly $287,000 in its first year of selling Slim–Fast products under the Distribution Agreement ...." (D.I. 117 at 6.)

Chemipal alleges that Slim–Fast did not use the Grey 1997 Plan, but rather created and authorized its advertising expenditures "based solely on its internal projection of sales." (D.I. 131 at 4–5.) Slim–Fast admits that "it made initial advertising budget estimates based on past sales, and it approved actual advertising expenditures on a month-to-month basis, based on actual sales." (D.I. 117 at 7.)

Chemipal alleges three counts in its Complaint. First, it alleges that:

> [t]he defendant Slim–Fast, in express violation of the aforesaid provisions of the Agreement between the parties, failed to create or develop an advertising and promotion plan for the sale of the Slim–Fast products in the State of Israel. Additionally, the defendant company failed to develop or disseminate advertising materials related to the sale of the Slim–Fast products in the State of Israel nor did it supply the plaintiff distributor with any of the promotional materials which were reasonably necessary to promote the sale of said Slim–Fast products within the State of Israel.

(D.I. 1 at ¶ 12.) Second, it alleges that: "The defendant has failed and refused to expend the required funds on advertising necessary to insure the generating of the projected sales. The defendant has thereby deliberately and intentionally breached its duty of good faith and fair dealing to the plaintiff in connection with the aforementioned Agreement." (*Id.* at ¶¶ 21–22.) And finally, it alleges that: "The defendant breached its promise to provide appropriate and necessary advertising literature

and promotion support to promote the sale of the Slim–Fast products in Israel." (*Id.* at ¶ 30.)

As to damages, Chemipal alleges that it suffered damages in amounts that it reasonably believes will exceed $750,000 for Count One, $1,500,000 for Count Two, and $1,500,000 for Count Three. (D.I. 1 at ¶¶ 14, 23, 32.)

The Distribution Agreement contains a choice of law provision wherein the parties agreed that any dispute would be governed by Delaware law and be heard by a court in Delaware. (*Id.,* Ex. A at 4.)

### III. STANDARD OF REVIEW

#### A. Motion to Preclude Testimony

 Motions to exclude evidence are committed to the court's discretion. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir.1994) (on a motion to exclude proffered expert testimony, the trial court's inquiry is a flexible one, and its decision to admit or exclude expert testimony is reviewed under an "abuse of discretion" standard) (internal citations omitted). "[W]hen the district court's exclusionary evidentiary rulings with respect to scientific opinion testimony will result in a summary or directed judgment," the Court of Appeals will give those rulings "a 'hard look' to determine if a district court has abused its discretion in excluding evidence as unreliable." *Id.* at 750.

#### B. Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). In determining whether there is a triable issue of material fact, a court must review the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citation omitted). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Inds. Co., Ltd.,* 475 U.S. at 587, 106 S.Ct. 1348 (internal citation omitted). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### IV. DISCUSSION

#### A. Motion to Preclude Testimony

 Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness

qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise ...." The party offering the expert testimony has the burden of proving admissibility. *See Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786 (citation omitted). The subject of an expert's testimony must be grounded in the methods and procedures of science and based on more than a subjective belief or speculation. *Id.* at 589–590, 113 S.Ct. 2786. Further, Rule 702 requires that expert testimony assist the trier of fact, in other words, it must "fit" the issues in the case by having a "valid scientific connection to the pertinent inquiry." *Id.* at 591–92, 113 S.Ct. 2786.

■ In determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess whether the methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts at issue. *Id.* at 592–93, 113 S.Ct. 2786. As part of that inquiry, the court "must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the expert and the methodology used." *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 153 (3d Cir.1999).

■ A party can only elicit expert testimony from someone who has specialized knowledge or training sufficient to qualify him or her to opine on an issue within their field of expertise, and the expert's opinion must be confined to that field. *See Redman v. John D. Brush & Co.,* 111 F.3d 1174, 1179 (4th Cir.1997) (metallurgist not qualified to testify about industry standards for safes); *Barrett v. Atl. Richfield Co.,* 95 F.3d 375, 382 (5th Cir.1996) (expert not qualified to testify about correlation of chemical effects on rats and on humans). Moreover, testimony of an expert that constitutes mere personal belief as to the weight of the evidence invades the province of the factfinder. *See McGowan v. Cooper Indus., Inc.,* 863 F.2d 1266, 1273 (6th Cir.1988) (expert permitted to testify as to the customary duty of factory representatives in the air compressor industry, but should not have been permitted to opine on breach of such duty because the jury was equally qualified to make that determination); *S.E.C. v. Lipson,* 46 F.Supp.2d 758, 763 (N.D.Ill.1998) ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand.").

Chemipal retained Dr. Avichai Shuv–Ami as an expert to "meet its burden of proving its lost profits." (D.I. 132 at 3.) In its Motion to Preclude Testimony, Slim–Fast argues that Dr. Shuv–Ami's proffered testimony, "as set forth in ... [his] Initial Expert Opinion Report (the 'Report'), ... and as further explained at ... [his] deposition[,]" pertaining to Chemipal's damages in the form of lost profits and reputational harm fails to "meet any of the requirements imposed by *Daubert* and the Federal Rules, and should therefore be precluded ...." (D.I. 113 at 1.) Because I agree that Dr. Shuv–Ami's proffered testimony fails to satisfy the requirements imposed by *Daubert* and the Federal Rules of Evidence, Dr. Shuv–Ami's opinion will be excluded from the case.

Dr. Shuv–Ami's opinion is that because of Slim–Fast's failure to conduct the agreed upon advertising campaign, Chemipal suffered $3,185,000 in lost profits during the term of the Distribution Agreement and $2,632,726 in lost future profits based on reputational harm. (D.I. 114, Ex. 1 at 3, Dr. Shuv–Ami's Report.) Dr. Shuv–Ami arrived at these calculations for lost profits through a three-step process. First, he concluded that Slim–Fast's promotion and advertising budget should have

been in the range of $700,000 per year, with the first year between $800,000 and $900,000 and subsequent years between $500,000 and $600,000. (*Id.* at 2.) Had Slim–Fast spent this amount in the first year, Dr. Shuv–Ami's opinion is that it would have resulted in $2,000,000 in sales for that year. (*Id.*) Second, he applied particular growth rates in the subsequent years to arrive at an estimate of sales in each subsequent year. (*Id.* at 3.) Third, for each year, he subtracted Chemipal's actual sales of Slim–Fast's products from his estimate of sales, and then reached his final damages calculation by using a 25.48% gross profit margin. (*Id.* at 8.) For his calculation of lost future profits based on reputational harm, Dr. Shuv–Ami also used a 25.48% gross profit margin. (*Id.* at 11.)

The crux of Slim–Fast's argument is that Dr. Shuv–Ami's opinions are the product of insufficient data and unreliable methods. (D.I. 113 at 21–33.) Chemipal's response is essentially that Slim–Fast's arguments are directed to "the weight to be given the opinions which he has reached," not "the admissibility of . . . [his] opinion." (D.I. 132 at 5.)

### 1. Lost Sales and Slimming Products Market Information

■ Slim–Fast argues that Dr. Shuv–Ami has no reliable basis for his opinion that Chemipal would have achieved $2,000,000 in sales if Slim–Fast had spent $700,000 on advertising. (D.I. 113 at 21–26.) Dr. Shuv–Ami calculated $2,000,000 in sales based on the Grey 1997 Plan and presentation that the size of the diet market in Israel was in the range of $100 million, that the slimming products market in Israel was $20 million of that total, and that Slim–Fast could and would achieve 10% of the sales in that market. (D.I. 114, Ex. 1 at 6, Dr. Shuv–Ami's Report.) Slim–

Fast argues that Dr. Shuv–Ami's "blind faith" in the Grey 1997 Plan's sales goal as the measurement of lost sales is "the antithesis of the methodological rigor demanded by *Daubert.*" (D.I. 113 at 22.) Specifically, the desire to achieve 10% of the market was a "marketing objective," which, as Dr. Shuv–Ami testified, was a goal that may or may not have been achieved. (D.I. 113 at 8; D.I. 123, Ex. 3 at 175–76, Dep. Dr. Shuv–Ami, Aug. 13, 2004.)

Additionally, Slim–Fast argues that Dr. Shuv–Ami had no reliable basis for accepting the accuracy of the $20 million slimming products market estimate in the Grey 1997 Plan. (D.I. 113 at 24.) According to Slim–Fast, Dr. Shuv–Ami did not conduct any independent analysis, did not use any expertise to evaluate two secondary sources relied upon by the Grey 1997 Plan, and does not know what the data represents, how it was compiled, or how it as evaluated or chosen by Grey Israel. (*Id.* at 9.) Slim–Fast argues that without any independent analysis or verification to demonstrate that the $2,000,000 "marketing objective" would have been achieved but for Slim–Fast's breach, Dr. Shuv–Ami's opinion is inherently unreliable. (D.I. 113 at 23.)

In response, Chemipal argues that "Dr. Shuv–Ami's reliance on the viability of . . . Grey Advertising's statement as to the nature of the anticipated sales . . . is not improper." (D.I. 132 at 10.) Chemipal's main argument is that because Grey Advertising is "a reputable worldwide advertising agency" Dr. Shuv–Ami was entitled to rely upon it "as a recognized fact as to the state of the market in January, 1997 and can be used by . . . [him] in formulating his opinion." (D.I. 132 at 11.)

In light of the record that the parties have presented, Slim–Fast's position prevails. Dr. Shuv–Ami's work product sim-

ply does not withstand the basic test of reliability. He did not know what he was basing his testimony on, as his deposition testimony revealed. Dr. Shuv–Ami's testimony at his deposition discussing the two secondary sources upon which the Grey 1997 Plan relied, Business Data Israel and Globes Financial newspaper, shows that he simply adopted the Grey marketing plan without reviewing its underpinnings:

Q. What is Business Data Israel?

A. It is a data information group, that provides information for the business industry in Israel about markets, the development of the markets, et cetera.

Q. So did you review the Business Data Israel information that Grey is citing to here?

A. No.

Q. Why not?

A. I have confidence that what they wrote here is correct.

Q. Okay.

A. It is a quote from the report of the BDI.

Q. And how do you know that it is a correct quote from the report of BDI?

A. Because they are reliable advertising agency and I know them. . . .

Q. So, now, you are basing your -so you did not look at the sources, the Business Data Israel source?

A. No.

Q. Could you have looked at it?

A. It is difficult to maintain, it is expensive. . . .

Q. What is Globe's financial newspaper?

A. It is newspapers, business newspaper in Israel. . . .

Q. Does Globe financial newspaper conduct its own market surveys?

A. Usually they give—if they want have to research, they give one of the research companies to do for them research.

Q. So, this would be Globe's printing of another company's research?

A. Yes. . . .

Q. Do you know the source of the market research that Globe's financial newspaper published?

A. No, I don't know.

Q. Do you know how Grey arrived at this $100 million number?

A. No.

Q. Do you know how they arrived at the $20 million number for slimming products?

A. No.

Q. Do you know if the research that was conducted to yield these numbers, do you know what the research included?

A. No, but if it is—come from the BDI or research that Globe did, I presume it is reliable.

Q. You presume it is reliable?

A. Yes.

Q. But you have no idea what the research was?

A. No.

Q. Do you know what the questions were that were asked?

A. No.

Q. Do you know what the products were that were considered slimming products?

A. They have later, the list of slimming products which I presume came from this report.

Q. Do you know what the programs were, did it include exercise programs?

A. I think they defined here the slimming programs, I think. I am trying to—I can tell you what my under-

standing. Slimming programs is that somebody is going on a diet.

Q. Ah-hum.

A. One way or the other. Either they own programs or programs that they go to a certain place.

Q. Where are you getting that information from?

A. That is my understanding.

Q. But, do you know what—do you know how these research surveys defined the programs?

A. No.

Q. Or defined the products?

A. No.

Q. So, did you do anything to check for yourself whether the numbers in this document, the hundred million number and the $20 million number were accurate?

A. My answer is like that, I am using myself in different projects, the BDI information, and if they give me information, it is reliable information because the way they collect the information is very extensive. And, that is why if I get information and the source says "BDI," I accept it as it is.

Q. But, I want you to answer my question. Did you do anything—do you do anything to check for yourself, whether the numbers—

A. No.

Q. —here were accurate?

A. I did not.

Q. ... Do you know how Grey assembled the data that they got for this report?

A. No.

(D.I. 123, Ex. 3 at 128:22–137:6, Dep. Dr. Shuv–Ami, Aug. 13, 2004.)

In addition to this blind reliance on the Grey 1997 Plan, Dr. Shuv–Ami testified that his opinion on the size of the slimming products market was also based on his "experience in analyzing markets." (*Id.* at 108:22–23.) His deposition testimony makes clear, however, that in formulating his opinion based on his experience, he relied upon the same secondary source information used in the Grey 1997 Plan and that in fact, Dr. Shuv–Ami actually used the Grey 1997 Plan to acquire the secondary source information.

Q. Is that opinion based on anything other than the Grey suggestion?

A. No, it is also my own experience. . . .

Q. What experience do you have in the diet products market? ...

A. I don't have specific experience in diet market but I have experience in analyzing markets. . . .

Q. So to analyze the diet products market, wouldn't you have to get secondary information about the diet products market?

A. Yes.

Q. Did you get any secondary information about the diet products market?

A. I got it from Grey reports.

(D.I. 123, Ex. 3 at 108:10–111:12, Dep. Dr. Shuv–Ami, Aug. 13, 2004.)

Dr. Shuv–Ami thus testified that his opinions on Chemipal's lost sales, the size of the slimming products market, and the amount of advertising that Slim–Fast should have spent to achieve those sales are based on the Grey 1997 Plan. Dr. Shuv–Ami at one point attempted to confirm the market conditions as reported in the Grey 1997 Plan by retaining a research firm to conduct a market survey. (*See* D.I. 123, Ex. 3 at 177, Dep. Dr. Shuv–Ami, Aug. 13, 2004.) The market survey, however, has been stricken from the record by the parties' August 20 stipulation (D.I.

105),[2] leaving Dr. Shuv–Ami's opinion entirely dependent on an uncritical acceptance of the Grey 1997 Plan.

Chemipal cites only one case, *J.E. Rhoads & Sons v. Ammeraal, Inc.*, 1998 WL 32012 (Del.Super. Mar. 30, 1988) ("*J.E.Rhoads*"), in support of its argument that Dr. Shuv–Ami was entitled to rely upon the "market objectives" in the Grey 1997 Plan in calculating lost profits. (*Id.* at 9.) In the portion of *J.E. Rhoads* relied upon by Chemipal, the Delaware Superior Court concluded that "the issue of damages must await development of the evidence at trial" because in viewing "the evidence and inferences in a light most favorable to the non-moving party" the "pre-termination sales history, post-termination performance and market assessment provide some basis for the sales projections," upon which damages were based. *J.E. Rhoads*, 1988 WL 32012, at *11. That case, however, did not address the admissibility of expert testimony, and, more specifically, it did not address the propriety of a damages expert making untested, and unverified marketing projections the foundation of a damages calculation. Therefore, it does not support Chemipal's argument for Dr. Shuv–Ami's reliance on the Grey 1997 Plan.

Chemipal has not satisfied its burden of proving the admissibility of Dr. Shuv–Ami's opinions on these issues because he

does not understand the methodology used to gather the information in the Grey 1997 Plan or the methodology used by those who performed the research for the secondary sources. *See Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786 (citation omitted). Essentially, his "lack of familiarity with the methods and the reasons underlying ... [Grey Israel's] projections virtually precluded any assessment of the validity of the projections through cross-examination." *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732 (10th Cir.1993); *cf. In re Paoli,* 35 F.3d at 748 ("If the expert's reliance on animal studies to draw conclusions about people constitutes a methodological flaw, it is a methodological 'flaw' *consisting of* relying on data not of a type reasonably relied upon by experts." (original emphasis)). Therefore, the record simply does not support Chemipal's argument that Dr. Shuv–Ami's reliance upon Grey Israel's projections was proper under *Daubert* and the Federal Rules of Evidence.

### 2. Growth Rate of Chemipal's Lost Sales

■ Slim–Fast argues that Dr. Shuv–Ami's opinion as to the growth rates of Chemipal's sales over the term of the Distribution Agreement is unreliable because his opinion was an "approximation" based on his "experience." (D.I. 113 at 13.) Furthermore, he conducted no calculations

---

**2.** A dispute arose between the parties regarding the market survey, with Slim–Fast asserting that the market survey ought to be stricken from Dr. Shuv–Ami's Report because Chemipal failed to make Rule 26(a) disclosures for the individual or individuals who conducted the survey. (D.I.76.) At a telephone conference on August 13, 2004, Slim–Fast argued that it would not have an appropriate opportunity to test Dr. Shuv–Ami's reliance upon the market survey in his Report, because "he didn't conduct those analysis [sic]." (D.I. 102 at 13:2, Telephone Conference, Aug. 13, 2004.) Chemipal's po-

sition was that the survey was merely "an attempt to verify the information in the Grey report.... So it's just basically additional information to verify the report he had." (*Id.* at 11:20–12:1.) I told the parties I would defer ruling on this issue until after Slim–Fast had the opportunity to depose Dr. Shuv–Ami (*id.* at 13:17), so that I could determine how his testimony "affects, if at all, the positions the parties have taken" (*id.* at 13:25–14:1). Following Dr. Shuv–Ami's deposition, the parties submitted a stipulation striking any use of the market survey in this case. (D.I.105.)

to arrive at this growth rate, did not base the growth rates on any experience with growth in the diet products industry, and did not base his growth rates on any "specific growth rate of a product in another industry." (*Id.*) Rather, "he gave a 'ballpark' estimate of growth rates based on his own recollection of growth rates of other products he had worked with in the past—without checking the accuracy of his recollection or the specific growth rates of those products—and he relied upon the now-stricken Market Survey to corroborate his growth rate estimations." (*Id.*) Chemipal's response is directed to the portion of Slim–Fast's argument that attacks Dr. Shuv–Ami's experience in the specific product market, but not Slim–Fast's arguments attacking the methodology employed by Dr. Shuv–Ami in reaching his conclusions. Chemipal summarizes Slim–Fast's argument as: "The defendant insists that the absence of specific experience with the marketing of 'slimming products' disqualifies Dr. Shuv–Ami from offering any opinion with respect to the growth rate of sales under the terms of the Distribution Agreement." (D.I. 132 at 14.) Chemipal then presents its counter-argument "that Dr. Shuv–Ami's breadth of experience is more than sufficient to support the opinion he had proffered." (*Id.*)

Chemipal's position, if accepted, would eviscerate the standards set by *Daubert* and Federal Rule of Evidence 702. Dr. Shuv–Ami's opinion on growth rates is based on an approximation of the growth rates of other products without making a "valid scientific connection to the pertinent inquiry" here, namely the potential growth rate for a specific diet product. *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786; *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir.1999). Furthermore, Chemipal utterly fails to address this concern. Dr. Shuv–Ami's testimony at his deposition supports Slim–Fast's attack on the reliability of his methodology in forming his opinion regarding growth rates:

Q. How did you come up [with] the growth percentages?

A. It is based on my experience and normal care of selling products in Israel.

Q. So, what products are you referring to?

A. I have experiences of a variety of products, I know the way they grew up.

Q. You know their growth percentage rates?

A. About, yes.

Q. So what product in particular, are you speaking about?

A. Chocolate, beer, juices, variety.

Q. Any particular brand or just the product in general?

A. No, it is particular brand.

Q. What brand?

A. It is Turborg, Carlsberg, Prigat.

Q. What other brands?

A. Cadbury chocolate and some others.

Q. What others?

A. Cosmetics.

Q. What brand?

A. A sub brand of Helena Rubenstein that I did a few years ago. I don't remember.

Q. All right. Let start with Prigat. What was its sales growth after the first year of re-launch?

A. I don't remember exactly numbers. But I can tell you this is approximate numbers.

Q. Approximate.

A. I don't remember exact numbers of growth.

Q. Did you bo back and check?

A. Did I go back and check? No. I have in my mind, ballparks of numbers that is based on my experience in variety of products. If you ask me now if I remember, I don't remember.

Q. So, you don't remember the sales growth figures of Prigat or Cadbury or Helena Rubenstein?

A. No, not exactly and not now. You but I numbers in my head that I know, from my experience that that was what happens. If it is successful.

Q. When you say "not now", did you know the numbers when you were doing the reports.

A. It is the same thing. I know approximately.

Q. You had an approximate ballpark in your mind?

A. Yes, exactly.

Q. Okay. Did you do anything to check those ballpark figures?

A. No.

Q. Now, did you know that Slim Fast's sales would grow?

A. I presumed it.

Q. And why did you make that presumption. What did you base that presumption on?

A. It is a strong brand. It is an American brand. It has a good promise and people said they will buy it. And potential of it was much higher than what I wrote here.

Q. And when you say people said they would buy it and the potential are you talking about the . . . market survey?

A. Yes. . . .

Q. So, did you make your assumption on the growth at all based on the Grey materials?

A. No. . . .

Q. How do you know that Slim Fast had potential to grow? What do you base that on?

A. The potential market in my view, was large as indicated by the survey. . . .

Q. Is your opinion that the market was good and that Slim Fast products would grow based on anything other than the survey?

A. It is my experience.

(D.I. 123, Ex. 3 at 231:23–236:14, Dep. Dr. Shuv–Ami, Aug. 13, 2004.)

Dr. Shuv–Ami's opinion does not provide an even remotely adequate explanation to bridge the "analytical gap between the data and the opinion offered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). First, he has no recollection, and has not verified the accuracy, of the other products' growth figures upon which he bases his opinion. And second, he does not demonstrate how his general experience and "approximate" knowledge of the growth rates of those other product markets translates into the potential growth rate for Slim–Fast's diet products. *Pfizer, Inc. v. Advanced Monobloc Corp.*, No. 97C–04–037–WTQ, 1999 WL 743927, at *5 (Del.Super.Ct. Sept.2, 1999) (excluding expert testimony under Daubert and Delaware Rule of Evidence 702, which is identical to its federal counterpart, because "there is no explanation as to the differences in the product line (i.e. Barbasol is a value based men's line and Pure Silk is a premium brand women's line) or any evaluation of the men's market in comparison to the women's market.") Dr. Shuv–Ami's predictions are "simply not objectively verifiable because [he] has not developed enough of an objective basis in the record for such opinions." *Id.*

### 3. Reputational Harm

■ The third cause of action alleged in Chemipal's Complaint is that it suffered "direct damages ... as well as consequential damages to its good name and reputation ...." (D.I. 1 at ¶ 31.) Slim–Fast argues, in its Motion to Preclude Testimony (D.I. 113 at 29) and its Motion for Summary Judgment (D.I. 117 at 34–36), that under Delaware law,[3] "consequential damages in the form of good will, lost future profits, and lost customers are not awarded in breach of contract actions." (D.I. 113 at 29; D.I. 117 at 34 (quoting *Crowell Corp. v. Himont USA, Inc.*, Civ. A. No. 86C–11–125, 1994 WL 762663, at \*3 (Del.Super.Ct. Dec.8, 1994)).) Chemipal cites no case law in response and only asserts that Dr. Shuv–Ami's opinion is that Chemipal has suffered reputational harm as a result of Slim–Fast's breach of the Distribution Agreement. (D.I. 132 at 14.)

Based on the holding in *Crowell*, as cited by Slim–Fast, and the lack of case law to the contrary, it appears that Delaware law does not permit damages for the reputational harm asserted by Chemipal. "The Delaware courts have consistently found these damages to be speculative in nature, and; therefore, have barred recovery for them." *Crowell*, 1994 WL 762663, at \*3 (citing *Tanner v. Exxon Corp.*, No. 79C–JA–5, 1981 WL 191389, at \*2–\*3 (Del.Super.Ct. July 23, 1981)). Because this conclusion is a matter of law, expert testimony by Dr. Shuv–Ami on the issue would be inappropriate and must be excluded.

For the reasons discussed above, Dr. Shuv–Ami's opinions fail to satisfy the requirements of *Daubert* and Federal Rule of Evidence 702 and are thus inadmissible as evidence in this case. Therefore, Slim–Fast's Motion to Preclude Testimony (D.I. 112) will be granted.[4]

### B. Motion for Summary Judgment

#### 1. Choice of Law

■■ A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's law governs the case before it. *Hionis Int'l Enterprises, Inc. v. Tandy Corp.*, 867 F.Supp. 268, 271 (D.Del. 1994) (citing *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). I am therefore bound to apply Delaware's choice of law rules. Under Delaware law, express choice of law provisions in contracts are generally given effect. *Hionis Int'l*, 867 F.Supp. at 271. The Distribution Agreement states that it "shall in all respects be governed by, and construed in accordance with, the laws of the State of Delaware ...." (D.I. 1, Ex. A at 4, the Distribution Agreement.) I find no reason to disturb the parties' choice of Delaware law. Therefore, I will apply Delaware's substantive law to the contract claims in this case.

#### 2. Damages—Lost Profits [5]

■ In its Motion for Summary Judgment, Slim–Fast argues that even if Che-

---

**3.** As discussed below, *see infra* Part IV.B.1, Delaware substantive law applies to the claims at issue.

**4.** There is also a dispute regarding the reliability of Dr. Shuv–Ami's testimony as to Chemipal's gross profit margin. Because the above rulings preclude reliance upon Dr. Shuv–Ami's opinions, that issue is moot.

**5.** Chemipal has also asserted a claim for damages based on harm to its reputation. As discussed above, damages for reputational harm are not cognizable under Delaware law. *See supra* Part IV.A.3.

mipal can sustain a claim for breach of the Distribution Agreement, it cannot demonstrate damages to a reasonable degree of certainty as required under Delaware law. (D.I. 117 at 29.) Chemipal's response must be teased out of several sources. In Chemipal's Reply Memorandum in Further Support of its Motion for Partial Summary Judgment (D.I.135), it argues in one sentence its damages claim: "damages have been set forth by Plaintiff's expert with sufficient certainty to submit the issue to the jury under Delaware law." (*Id.* at 9.) In Chemipal's Opposition to Defendant's Motion for Summary Judgment (D.I.131), its argument consists of two sentences: "This argument [by Slim–Fast] was addressed and diffused in Chemipal's Memorandum of Law in Opposition to Defendant's Motion to Preclude Dr. Shuv–Ami ['Opposition'] and will not be repeated here. In sum, there is sufficient evidence to properly allow the jury to determine the damages in this case." (*Id.* at 16.) Therefore, Chemipal's entire argument regarding damages is contained in its Opposition to Slim–Fast's *Daubert* motion, and hinges on the admissibility of the testimony of its expert, Dr. Shuv–Ami.

The only case that Chemipal cites in its Opposition which could reasonably be viewed as a response to Slim–Fast's argument described above is *J.E. Rhoads.* (D.I. 132 at 9.) Chemipal relies on *J.E. Rhoads* for the proposition that "the question of whether [sales] projections can provide ample evidence to support a claim of damages is an issue of fact to await development of evidence at trial." (*Id.* (citing *J.E. Rhoads,* 1988 WL 32012, at *11.))

In *J.E. Rhoads,* the Delaware Superior Court determined that it could not conclude that the evidence of sales projections was "so meager or uncertain as to afford no reasonable basis for inference." *J.E. Rhoads,* 1998 WL 32012, at *11. In reaching this decision, the court viewed the evidence and inferences in a light most favorable to the non-moving party, *id.,* as I must do in this case. The difference between *J.E. Rhoads* and the present case is that the Superior Court reached its conclusion because evidence was presented regarding "*J.E. Rhoads'* pre-termination sales history, post-termination performance and market assessment," which provided some basis for the sales projections. *Id.* The Superior Court, however, also stated that "if the first figure is proven to be unsupportable, the latter two would be without basis, if the facts are as stated." *Id.* In the present case, the only evidence and argument presented by Chemipal is that its expert, Dr. Shuv–Ami, was entitled to rely upon the Grey 1997 Plan's projection of sales. (D.I. 132 at 9.) As discussed above, Chemipal offered Dr. Shuv–Ami's testimony to "meet its burden of proving its lost profits." (D.I. 132 at 3.) There is no evidence that Chemipal relies on anything other than Dr. Shuv–Ami's opinion to satisfy its burden of proving damages with reasonable certainty.

Slim–Fast argues that the "calculation of the sales that Chemipal would have purportedly achieved but for Slim–Fast's alleged breach are speculative—and totally baseless—because such sales projections are based on the unsupported and unverified 'marketing objective' contained in a presentation made by an advertising agency." (D.I. 117 at 31.) Furthermore, Slim–Fast argues that, "Dr.Shuv–Ami's own extrapolations of the amount of sales revenue Chemipal would have realized over the duration of the contract are utterly unsupported by *any* evidence in the record." *Id.* (emphasis in original).

 Delaware law has established that "[i]t is axiomatic that a plaintiff, in order to recover damages from a defendant for breach of contract, must demon-

strate with *reasonable certainty* that [the] defendant's breach caused the loss." *Tanner v. Exxon Corp.*, No. 79C–JA–5, 1981 WL 191389, at *1 (Del.Super.Ct. July 23, 1981) (emphasis in original) (internal citations omitted). "[I]t is clear that, in order to recover profits lost by [the] defendant's breach of contract, the plaintiff must lay a basis for a reasonable estimate of his loss." *Id.* at *2 (internal citations omitted). "Speculative damages are not recoverable." *Id.* (internal citations omitted.) "Speculative profits are those the evidence of which is so meager or uncertain as to afford no reasonable basis for inference." *Id.* (internal citation omitted.) In *Tanner*, the Delaware Superior Court found that "when a profit history is established, recovery for lost profits is limited to those profits which might have been made pursuant to the performance of the particular contract sued on, during the period for which the contract was to run." *Crowell Corp. v. Himont USA, Inc.*, Civ. A. No. 86C–11–125, 1994 WL 762663, at *3 (Del.Super.Ct. Dec.8, 1994) (citing *Tanner*, 1981 WL 191389, at *3). Specifically, the Superior Court found that business records of sales for the years before the alleged breach occurred "could serve as the basis for a finder of fact to estimate profits lost ... [during the remainder of the contract term] due to [the defendant's] breach." *Tanner*, 1981 WL 191389, at *3.

As already noted, Chemipal's entire basis for asserting damages is Dr. Shuv–Ami's expert testimony, which, as discussed in Part IV.A, *supra*, must be precluded for lack of reliability. (*See* D.I. 132.) Because of the lack of record evidence presented by Chemipal, Chemipal's damages claims are speculative and therefore summary judgment for Slim–Fast is appropriate.

## V. CONCLUSION

Based upon the foregoing, Slim–Fast's Motion to Preclude Testimony (D.I.112)

and Motion for Summary Judgment (D.I. 116) will be granted, Slim–Fast's Motion to Dismiss (D.I.10–1) and Motion for Partial Summary Judgment (D.I.10–2) will be denied as moot, and Chemipal's Motion for Partial Summary Judgment on Counts I and II of the Complaint (D.I.108) will be denied as moot.

### *ORDER*

For the reasons set forth in the Memorandum Opinion issued in this matter today, IT IS HEREBY ORDERED that Slim–Fast's Motion to Preclude the Testimony of Dr. Avichai Shuv–Ami at Trial (D.I.112) is GRANTED, Slim–Fast's Motion for Summary Judgment (D.I.116) is GRANTED, Slim–Fast's Motion to Dismiss Counts Two and Three for Failure to State a Claim (D.I.10–1) and Motion for Partial Summary Judgment (D.I.10–2) are DENIED as moot, and Chemipal's Motion for Partial Summary Judgment on Counts I and II of the Complaint (D.I.108) is DENIED as moot.